Good morning, Your Honors. Blythe Bach on behalf of Officer McNamara. This appeal is a very narrow and straightforward appeal. And the reason why I say narrow is because there are really only a few undisputed facts. And these are undisputed. We are not challenging any triable issues of fact. We are relying on what the plaintiff says and the portions of the videotape that do not appear to be at issue. So the first undisputed fact is that Officer McNamara had literally just left the corpse of a shooting victim. And when he left that shooting victim, he came out to the street and a bunch of civilians were yelling at him, he's got a gun, he's got a gun. He then goes to the restaurant, walks up the stairs, he's the only officer that makes it to the stairs, and as soon as he does, he sees Greene holding a gun. The gun he's holding up in the air, there's a crowd of people everywhere, and McNamara is concerned for his safety and the safety of everybody around him. The third fact that's undisputed is that Greene did not release the gun until McNamara shot. Because if you look at the video, in particular the security video, I think it's Exhibit I, you can see that the events happened at the exact same time. The moment that McNamara shot is when you can see Greene releasing the gun. Until Greene released the gun, there was danger. There was danger to everybody in that restaurant. And so the Fourth Amendment looks at these cases objectively. Objectively speaking, how would a reasonable officer have responded? And here we have an officer who came upon a very chaotic scene, having just left a shooting homicide scene, and all he knows is the guy has a gun and he's pointing it upwards. Now, there are facts that Greene has brought out in his answering brief and even facts that the district court brought out. None of those facts are material. None of those facts matter here. So, for example, Greene was apparently a hero. He was a football player, a hero, a good college student, all that. But McNamara had no idea that that was the case. All he knew was that he encountered a man with a gun. And I'm sorry, I need to interrupt myself because I realized I didn't ask to reserve time. I'm going to reserve three minutes. That's fine. Okay, sorry. And so that's what the Fourth Amendment looks like, looks at. So would a reasonable officer have responded in this way? And I can't imagine an officer coming upon the scene seeing a man with a gun who he doesn't know is a hero. He doesn't know he's a football player. He doesn't know any of that. And the other issue that has... Now, the gun was not pointing at him, right? Right. The gun was not pointing at Matt Greene. That is true. It wasn't pointing at any, it was either up or down. It was up primarily and Greene makes much of the fact that he, I guess, lowered his arm. Well, he dropped it. Right. But you can see him lowering his arm. But our position is that until that gun is released, he's still a danger because even lowering his arm is a threat. That doesn't mean you can't shoot just because your arm is like this instead of like this. So that's no protection at all. Can we consider the fact there were, I don't know, five or six officers there, all of whom were probably did make a big point of that. And let me tell you why it's not relevant. Because you can see this in the video. There is, there are a bunch of officers, but only McNamara made it to the top. Only McNamara was confronting Greene. The other officers were way down on the stairs. In fact, I think two of the officers testified they didn't see anything. They literally could offer nothing because they couldn't even see. Some of the officers were fairly close. I mean, there were some steps, but these weren't, you know, 30 steps. There were maybe five or six, just a few steps to the restaurant. So some of them could have been vulnerable and probably saw similar things that Officer McNamara did. Essentially, but McNamara was the one leading the charge. McNamara was the one that was only a few feet away from Greene. And McNamara was the very first person to alight upon the scene. And those The gun isn't pointed toward the people inside the restaurant. The gun isn't pointed toward the police officer. At what point did the officer say, drop your gun or what's going on here or some kind of warning? If you don't drop your gun, I'm going to shoot you. I mean, it's almost like the fact that he was coming from the scene of a murder influenced him to not see what was going on here objectively. He was like, maybe in a rush or something, and he didn't follow all the steps before you shoot someone. Well, he did order and you can hear on the videotape, not only McNamara, but the other officers as well ordered Greene to drop his gun. That was an order that they made. When did they make it? As there, well, McNamara, it looks like he made it as he's walking. I'm sorry, what? Was shooting? No, as he's walking up the stairs, you can hear and they're all using profanity and they're telling him to drop the gun. Even the district court said there was a cacophony of officers telling him to drop the gun. So a cacophony of officers saw him with the gun and only McNamara shot? Right, because only McNamara was actually confronting him. Only McNamara was a few feet away from him. Only McNamara had made it up to that top step. This sounds like a good argument for the jury. Well, there would be no jury because we're literally relying on what Greene has said. When I looked at Greene's brief, literally the plaintiff's narrative, there's no dispute there. We're not disputing any facts. We are not disputing any facts. The only thing that we're relying on is literally what Greene himself has testified to because Greene acknowledges that he had the gun up. And then the other aspect of this is the clearly established law issue, which I think is extremely important. And the Lopez case that the district court relied on is wildly, wildly inapplicable. Lopez is a case where a kid is walking down the street doing absolutely nothing wrong. There's been no reports of criminal activity, nothing. He's just a kid walking down the street. And it is true that the gun, in that case, the district court had found that the gun was pointed down and not a threat and the Ninth Circuit was stuck with that factual finding, something that we don't have here. But the difference is... Well, here the gun is up. Right. What difference does it make? Well, because in Lopez, the court found dispositive that it was pointed to the ground as if somehow the Lopez court at least found that to be not threatening. But I think it's more important to look at, because when you're looking at clearly established law, it doesn't have to be exactly on all fours, but it does have to be in the realm of factual similarities. Lopez is a 13-year-old kid who is just walking down the street. In Lopez, the kid was actually running away from the officers, not towards them, away from the officers. In Lopez, he was in a very desolate area. The court specifically said nobody was around him. In other words, nobody had the chance of getting shot, right? Look at that in comparison to our case. Green was in the middle of a very chaotic situation and fine, he was a hero. It wasn't of his doing. He grabbed the gun to try to protect everybody. That's fine. That might very well be the case. But that's not what we look at for qualified immunity. For qualified immunity, we look at, objectively speaking, how would a reasonable officer have responded? That reasonable officer saw somebody holding a gun up in the air. Actually, in the district attorney's report, they noted that holding a gun up in the air is actually more of a threat than anything, because that's the easiest way to shoot somebody. Either way, holding a gun like this with your fingers on the gun, and that is undisputed, and that's also on the videotapes, does engender fear in a reasonable officer. What do we know that McNamara saw when he got up the top of the stairs? He testified that the first thing he saw was the gun. When you look at the videotapes, you can understand that, because when Green is going through the glass door, the gun sort of leads. And then Green is holding, the door opens, it looks like. Well, when you look at the first couple of videos, it looks like Green is inside. You can barely, what you can see, I guess in his left hand, the gun is up, and you can see a person. Right? Is that what? I didn't really see a person, but he does come out of that glass door, yes. And you do see him momentarily behind the glass door. I'm not sure if McNamara saw that. All we know, McNamara testified that the first thing he saw was a gun. And when you look at the videotape, you see that Green leaves with his gun as he leaves. Okay. Did you want to say, do you have anything else you want to make, or do you want to save your remaining time? I want to save, unless the panel has any questions whatsoever. Thank you. Good morning, Your Honor. May it please the Court. Can I start? Actually, I'm sorry. Yes. All right. Excellent. Sorry. Good morning, Your Honors. May it please the Court. Patrick Buolno on behalf of the Plaintiff Appellee. This is a case that has been heard actually in this court before, dozens of times over the decades. It's a harrowing gesture case. Did affirmative movement occur? Because we have an armed, non-threatening suspect that was fired upon by an officer. And we have video evidence, fortunately, that shows the very last second, the very last image that McNamara would have seen, which is my client who had in compliance, immediate compliance, with officers' order to drop the gun. You can see him. He opens the door. He sees the officers. And the gun isn't just being held like this. It's being used to push open the door. And he lowers the gun. As the officer is saying, drop the gun. And he raises his right hand in a universal term of surrender. He's doing exactly what officers want you to do when they make verbal commands. And the officers elicited the exact response they wanted, which is why five other officers did not shoot. And McNamara shot him, not just once, but five times. Five times when the gun is in a non-threatening position and he was in the act of surrendering. Every single Ninth Circuit case, and even Supreme Court case going back to Tennessee v. Garner, has found shooting a person under these circumstances, essentially a non-threatening suspect who's armed, as being a violation of the Constitution. If we're wondering why he shot, you can just take McNamara at his word. He texted just hours later why he shot him. He said it was because he was an N-word with a gun in the Wild West. That is not a sufficient reason to shoot a person. But we look at this objectively. Of course, Your Honor. I would note, though, we do take an account of the officer's own statement as to why he shot. He's saying he shot because at some point the gun was pointed into the restaurant. But at summary judgment and in these briefs, they can't point to any image where that's happening. And no other officer saw that. And also, when he had the opportunity to speak, not to justify or when he thought someone was listening, but when he was being honest, he gave the exact reason why he shot, which is he saw an armed black man. This Court and the Supreme Court have said just being armed is not enough to justify deadly force. What should we do with the fact that Officer McNamara, before he came here, was at a scene where there was a shooting, a homicide. I guess they had not found a suspect yet. And maybe 50 yards or so, 100 yards, he goes to this place. Would a reasonable officer think that these two were related? So if he sees a gun, he would view that as more dangerous, even if that wasn't pointed at him? Sure. And no, you can't take that. It should be taken into consideration. But we also have to take into consideration that when he was going to the restaurant, people stopped him and said that he asked, are they shooting? And they said, no, they're just fighting or wrestling over the gun. So now he has an additional piece of information. The gun's not being fired. It hasn't been used inside the restaurant. So that's counterbalance. Also, even if that is the case, you can't just go up and shoot someone, right, if you don't know what's going on. That's not what the law says. And what we know from Estate v. Aguirre v. County of Riverside, a Ninth Circuit case, which this Court stated, Morris established that even in volatile, intense situations, officers must not use deadly force against non-threatening suspects, even if those suspects are armed. So we're describing a chaotic situation. It doesn't matter. They need to see some harrowing gesture. I counted 10 cases, Ninth Circuit cases, leading up to this one, where the Court has repeatedly held that. It doesn't matter if they're armed. You need some harrowing gesture. They haven't pointed at any harrowing gesture. I mean, let's just be real. He was surrendering. And that's what it looked like. And that's what it looked like to five other officers. And so a reasonable officer would not have fired. And at best, a reasonable jury needs to decide how to interpret these frames. When you look at the video, it seems like it occurred around the same time. And unfortunately, Mr. Green was just at the wrong place at the wrong time in no fault of his own. And it looks like there's maybe two or three seconds before he drops the gun, before someone says drop the gun. It's clear when you look at the video slowly, he probably doesn't hear them because he's looking inside the restaurant. There's a lot of ruckus. So he may not have heard it. And when he turns around, I think he finally does hear it. And then he immediately drops it. But that occurred so quickly. You know, it's one of those things, you know, do we second guess in that kind of situation what an officer does? I mean, it's easier to see exactly what happened when you look at the video snapshot. It's just unfortunate. But you know, what happens in real time, it's sometimes hard to second guess an officer's judgment. Well, what you're talking about is exactly what this Ninth Circuit confronted in Longoria versus Pinal County, which is a Ninth Circuit case from 2017. There were several officers confronting a suspect who had gone on a long car chase. And they were trying to get him to surrender. And he was outside of his car and he was waving his hands around. One of the officers, one only, several other officers did not shoot, one of them shot. He said, I thought I saw a gun in his hand and him take a shooting stance. There was video evidence, meaning there was an iPhone camera and a car camera of what the guy was doing. One, he didn't have a gun in his hand. And two, no one could identify in the video where he took the shooting stance. What the court said there was, at the end of the day, interpretation of what he was doing, whether or not he made a shooting stance at some point or some sort of harrowing gesture just based off the video, how to interpret that was for a jury to find. So similarly here, even if we make the argument, well, it moved quickly. I would argue that one, taking the facts in my favor, he made clear and obvious movements of surrender. But even if not, you look to Longoria and it's for a jury to decide how to interpret frame by frame video evidence. And that's a Ninth Circuit case denying qualified immunity on that very issue. So let's assume, just for purposes of discussion here, that a reasonable jury could find a constitutional violation. So they're asserting, well, okay, under the circumstances here and given the right that's at stake here in this context, law was not clearly established. So what law should have put the officer on reasonable notice that shooting in these circumstances would violate a person's constitutional rights, Fourth Amendment rights? Sure. There's so many to pick from. What's your best? I would say, let's go principle by principle. First and foremost, a state of a little past Gell House, the appellant described the circumstances wildly different from how they were and how the court ruled. But they are different. Yeah, they are different, but it was a worse situation. The kid had what looked like an AK-47 and he was walking and the cops actually called to him multiple times to drop the gun. He didn't, and this isn't over a second, finally the kid turns around and as he's turning around, this is the factual dispute, the gun is coming upwards. There's no video evidence to dispute it. It's just the officer's words. So the gun is coming upwards and he's turning around. What the Ninth Circuit said was, even there, which is a way more harrowing gesture, a gun coming up towards an officer, that the officer was on notice that if you call out to someone who has their back to you, that you should expect for them to turn around and that the gun may move in some manner and not to just fire. You need to give them time to comply with orders. That is almost identical to what happened here. You have a man whose back is to you, officers are shouting, drop the gun. He should have expected him to do exactly what he asked, which is to drop the gun, right? So he turns, he hears, he lowers the gun in compliance with the order, so the gun's all the way down, then he shoots. I can't fathom what the officer expected two of them to have done. Basically what we're trying to say is that there was no way for Mr. Green to have exited that restaurant without getting shot. He was getting shot, no matter what. Is that what we're saying? It just doesn't make sense. And that's because of a state of order. I mean, we can look to Colonel V. Ridgecrest police. That's a case where a guy had a submachine gun, and he was running through a house, and it was based off a domestic violence call. And the machine gun was pointed upwards, and the officer said he was turning around with it or he might fire it at someone. The officer fired. But because the gun wasn't being pointed at anyone or raised at anyone, the court said no. It has to be a furtive gesture. The city of San Jose knows better than anyone. Two or three of their cases have been denied this year, qualified immunity, where it was a furtive movement. One of them was a guy with a rifle that was walking towards a school with children. And the question was, did he make, the officer that shot, and the other ones didn't, the officer that shot said he bowed out his arm like he was going to grab a gun or raise it up. Because the dispute of fact is whether or not to look at that gesture as threatening or non-threatening, it was clearly established at that time that an officer can't shoot a non-threatening suspect unless there's a furtive harrowing gesture. The decision of whether or not to consider that conduct as a harrowing gesture needs to be decided by a jury. So here, same thing. If we look at the video frame by frame and need to interpret how to look at Kayon's gesture, it's for a jury to decide whether or not it was harrowing or whether or not it was submissive. I posed to the court to even think of a better way in which he could have surrendered in that moment. He lowered the gun, dropped it, and raised his other hand in surrender. I just can't think of one, except the only reason I can think of why he shot is what he put in text message to his friend. We've also cautioned that we can't look at it frame by frame repeatedly. Said, well, it's easy for us, you know, in our chambers, our law offices, to do it frame by frame and analyzing it. But at the scene, we're not supposed to, and assessing it, to make sure that we're in their shoes, not in our shoes, after the fact, frame by frame. So I don't know how much weight we can give that. Well, then you go right back to denying qualified immunity, because in Longoria versus Pienaar County, this court said, if we have to interpret frame by frame video evidence, which was what they were trying to do there, they said then it's for a jury to decide how to interpret the frame by frame video evidence, whether or not it's a harrowing gesture. And I'll just read right from it. This is Longoria, and it says, it's for a jury to decide if in the process of surrendering is clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. So for a jury to decide if they were the person, those videos suggested the person was surrendering. Conversely, if, however, Rankin reasonably perceived that Longoria posed the threat of serious physical harm to Rankin or other officers, then he could have lawfully used deadly force. And what he said is, what the court said is, we're presented with a question of pure fact and not a question of law or mixed fact and law. And that's similarly here. A jury needs to decide whether or not this gesture was submissive or threatening. And so that case alone, the 2017 Longoria case, puts the officer on notice. Okay, so you said there were a number of cases that show that the law was clearly established. You cited the state of Lopez for now. Sure. So I would say... Any others you want to make sure we take a look at? Sure. CV by and through Villegas versus City of Anaheim. That's one where the gun was pointed up. And there was a dispute of fact about whether or not the officers gave the guy enough time to drop the gun. Villegas is the one with the rifle, right? Correct. And that one, the guy was holding the rifle, long gun, by the barrel. So for, you know, it would take time to move the long gun, to put it in his hand, put a hand on the trigger. So that's not entirely accurate. One of the officers said he was holding by the barrel. Another officer said he was holding it normally and upwards. Yeah, there's... And then another officer said... There's factual disputes they can resolve. If one officer says he's holding a long gun by the barrel, it's going to take time for that person to put it to use. Yeah, but either way, in denying the summary judgment on excessive force, the court said NCV by and through Villegas, they denied it because without providing a warning or sufficient time to comply or observing, Villegas moved toward the trigger or pointed at an officer. So the same thing. Every one of these cases say the same thing. And I also have Cruz v. City of Anaheim is another one. I have Kernow v. Ridgecrest Police, which is with a submachine gun. I have Dominguez v. Pina, which is a guy allegedly reaching into a car for a gun. I have Harris v. Roderick, which is a 1997 case. I have Peck v. Montoya, which is... All right. Your time is pretty much up. That's fine. And we've got your briefs. Okay. Thank you, Your Honor. Thank you. We have some rebuttal time for the city. Or for Mr. McNamara, for Officer McNamara. I think we need to be careful. There is a... And I know this panel knows this. There is a wealth of case law recognizing that we can't look at this with 20-20 hindsight and that officers are confronted with these kinds of situations and we can't second guess their split-second decisions. I think this is a textbook case wherein this officer was justified and in the... I think I really encourage the panel, and it sounds like you already have, to look at these videotapes because the videotapes really convey the danger and the stress as Mr. McNamara described it. The stress was through the roof. And everybody was anxious. Everybody was concerned. And we had a man with a gun in the middle of a restaurant. I'd like to just point out, the Greens counsel just argued that it's a factual dispute about whether he surrendered. No. Whether he surrendered is a legal conclusion for this court to make. The facts, the undisputed facts, are that he was holding the gun up, and let's just say the undisputed fact was that he lowered his arm. But surrendering is not a fact. It's a legal conclusion whether or not that was... What case says that, you know, that raising your hand is a matter of law, that's a legal determination or... No, it's just a fact. I'm just saying as a human being, that's a whereas the issue of whether or not he was surrendering is a legal conclusion for the court to make. I'm saying what case says that? Just in my own brain. And I think it's reasonable because what I... Well, it may be reasonable, but you know, it does help to have cases. Well, no, I'll tell you, there's plenty of cases. The Wavy County of Lyon case. The victim did not even have a gun, and he just... He went after the... He was... They had... The wife, I think, had called him in as a suicide, and he had gone after the officers, and when he charged at them, they shot him. And that is what has happened before where... And that's where the courts recognize that in these kind of situations, we can't look at it with the 20-20 hindsight. We have to look at it as the officer saw it. Now, the other thing I wanted to mention is that Green just said that the five officer officers thought that Green was surrendering. Absolutely not. There's no evidence of that. There were officers. Some of the officers said they didn't see anything. Some of the officers didn't necessarily support McNamara, but they didn't say anything like, oh yeah, Green was surrendering. There weren't any positive statements like that. That's just not in the record. The other officers, the record is sort of basically unclear about what they thought and what they perceived. But my position is that those other officers are not relevant, because as I said before, McNamara is the only one that made it up to the top of the steps. So let me ask you this. Is it your position that no reasonable jury could find a constitutional violation here? Or is it, yeah, they could find a constitutional violation here, but there's just no clearly established law and my clients should prevail on, Officer McNamara should prevail on? My position is that as a matter of law, these undisputed facts are not material. They do not amount. I didn't ask whether they were material. I asked you whether or not a jury could find a fourth amendment violation. I would say not, because at that point In your view, he loses both. No jury, no reasonable jury could find a constitutional violation. And even if they could, the Court should grant qualified immunity. Right. Because the issue for fourth amendment, there's the three factors. And one of the factors, and the courts over and over again say it's the most important factor, is whether or not the officer felt like safety was being threatened. And I think there's no way, when you look at these videotapes, to conclude otherwise, because Green might have been a hero, but it was terrifying what McNamara saw. And that was very scary to see a man in a crowded restaurant where everybody's claiming he's got a gun and McNamara's just left the corpse of a shooting victim. You keep saying crowded, but that's what I kept asking. What did McNamara see? Well, if you look at the videos, there's just people everywhere, and they're walking up. There are people outside. Yeah. But what did he see in the foyer? I think from the videotapes, it looks like you can see that there's, oh, and actually McNamara testified that when he came up, you see in the videotape that he goes to his left and he looks in the window. And he testified that when he looked in the window, he saw a bunch of civilians. I think he saw even a fight. But he did see people in the restaurant, and he testified to that. And also, the officers saw there were civilians. If you look at the videotape, it's a public street, and so there's lots of people that are potential victims to him. You're over your time. Thank you so much, Your Honors. Thank you. Thank you to both sides. We appreciate your arguments. Well done today.
judges: WARDLAW, PAEZ, LEE